UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                            :
BARCROFT MEDIA, LTD. et al.,                                :
                                                            :
                                    Plaintiffs,             :          16-CV-7634 (JMF)
                                                            :
              -v-                                           :          OPINION AND ORDER
                                                            :
COED MEDIA GROUP, LLC,                                      :
                                                            :
                                    Defendant.              :
                                                            :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_11/02/2017____

JESSE M. FURMAN, United States District Judge:

Plaintiffs in this case — Barcroft Media, Ltd. ("Barcroft") and FameFlynet, Inc. ("FameFlynet") — are the purveyors of entertainment-related photojournalism and owners of certain copyrighted celebrity and human interest photographs. Defendant Coed Media Group, LLC ("CMG"), which runs celebrity gossip and entertainment websites, displayed several of Plaintiffs' photographs (the "Images") on its websites without paying licensing fees or otherwise getting authorization. Plaintiffs now sue for copyright infringement. CMG concedes that Plaintiffs own the copyrights to the Images and that it used the Images without prior permission. Nevertheless, it contends that Plaintiffs waived most of their infringement claims and that, in any event, CMG's display of the Images was fair use.

Last month, the Court held a one-day bench trial on Plaintiffs' claims and CMG's defenses. In this Opinion and Order, the Court provides its findings of fact and conclusions of law. Ultimately, for the reasons set forth below, the Court finds that CMG's waiver and fair use defenses fall short, entitling Plaintiffs to injunctive relief and actual and statutory damages derived from the reasonable licensing fee CMG would have paid to use the Images.

# BACKGROUND

Based on the evidence and testimony presented at trial, the Court makes the following findings of fact by way of background. The Court includes additional factual findings in the context of the legal analysis below.

Plaintiffs provide entertainment-related photojournalism and own the copyrights for various paparazzi photographs and videos of celebrities and "other persons of interest." (PTX 46 ("Taylor Aff.") ¶¶ 8, 94). They acquire this content from photographers with whom they have ongoing relationships, in the form of employment agreements, assignment agreements, and work-for-hire agreements, (Taylor Aff. ¶¶ 9-10, 95), and Plaintiffs register new images received from their photographers with the U.S. Copyright Office, (Taylor Aff. ¶¶ 15, 102). Barcroft and FameFlynet employ the same copyright tracking service to register their copyrights; monitor digital uses of their photographs; identify such uses as potential infringements; and collect documentation, including screenshots, of potential infringements. (Taylor Aff. ¶¶ 2-7, 93).

At issue in this case are twelve images (or sets of images) owned by Plaintiffs and registered with the Copyright Office — namely, the Images.[1] The Images depict actress Salma Hayek (the "Hayek Image"), actress Amanda Bynes (the "Bynes Images"), singer Selena Gomez (the "Gomez Image"), actress Zooey Deschanel (the "Deschanel Image"), and actress Lea Michele (the "Michele Image"). The Images also include a depiction of a man waving a Union Jack in a matching hat and jacket while waiting outside the hospital for the birth of Prince William and Kate Middleton's child (the "Loughrey Image"); and photographs depicting a

---

[1] Plaintiffs' Amended Complaint lists eighteen Images as in dispute. (*See* Docket No. 14, Ex. 1). The parties stipulated to dismissal of Plaintiffs' claims relating to three of the photographs. (*See* Docket No. 28). Plaintiffs admitted that Images 1 and 9 are the same work, as are Images 2, 6, and 8. (*See* DTX 15, at 6).

mother and daughter, the former of whom underwent plastic surgery to resemble the latter (the "Horrocks Images"). It is undisputed that Plaintiffs own all of the Images; that Plaintiffs registered each Image with the Copyright Office; that CMG displayed the Images in whole or in part on its websites; and that CMG did not have Plaintiffs' prior authorization to do so. (*See* Docket No. 46 ("Def. Opp'n"), at 7 (describing various "issues that are not even disputed"); *see also* Docket No. 36 ("JPTO"), at 7-12.[2]

CMG runs several small popular culture, sports, and entertainment websites, which collectively receive roughly four million unique users per month. (JPTO 6-7; DTX 21 ("Coakley Aff.") ¶ 12). CMG has lost money every year since its inception, with the exception of 2012. (Coakley Aff. ¶ 15). In light of its business model and precarious financial situation, CMG does not license individual images for display on its websites; instead, it predominantly uses image subscription services to populate its websites with photographs. (Coakley Aff. ¶¶ 17-20). Indeed, the Chief Executive Officer of CMG testified that the company "would never pay a substantial fee to license any image for its Websites, which earn little revenue and have consistently been in the red." (Coakley Aff. ¶ 21). CMG's websites earn money by selling advertising space through online marketplaces. (JPTO 7; Coakley Aff. ¶ 24). CMG takes in approximately $1.50 per thousand visitors to one of its webpages. (Coakley Aff. ¶ 25).

Between 2014 and March 2016, CMG posted each of the Images on its websites. Cropped versions of the Hayek and Michele Images were both posted as rectangular banner photographs at the top of webpages, called "Daily Dumps," linking to celebrity gossip articles on

---

[2] In its pretrial briefing, CMG argued that it did not use the copyrighted version of the Loughrey Image, (Docket No. 43 ("Def. PFOF") ¶ 22; Def. Opp'n, at 12), and therefore that Plaintiffs could not establish a claim of infringement as to that Image, but it withdrew that argument on the record at the final pretrial conference.

other websites; the Images were edited to include text referencing the "Daily Dump" and to feature the CMG website's logo. (PTX 28; PTX 30). A thumbnail version of the Hayek Image also appeared in its entirety in the link roundup below the banner image. (PTX 28). The Bynes Images were used in their entirety in conjunction with an article on a CMG website titled "Amanda Bynes is Alive and Well in Mexico (and in a bikini) [Photos]," which commented on the actress's appearance and sought "to demonstrate her improved health after a stint in rehab and turbulent behavior on social media." (Def. PFOF ¶¶ 34, 37; *see also* PTX 29; DTX 22 ("Jackson Aff.") ¶ 30-31). The Gomez Image was cropped to exclude the subject's lower legs and was included in a gallery of twenty-five images showcasing a "risqué" fashion trend described by CMG as "Underbutt Fever." (Def. PFOF ¶ 29; PTX 31; Jackson Aff. ¶ 23). The Deschanel Image appeared at the bottom of an article titled "Zooey Deschanel Reveals Her Sea Animal-Inspired Baby Name." (PTX 34). Finally, the Loughrey and Horrocks Images were used to accompany CMG articles titled "These Grown Ass People Waiting For the Royal Baby Are Actually Psychotic" and "Mom Shells Out $57k To Look Like Daughter's Twin and It's Creepier Than it Sounds," respectively. (PTX 32, 33).

In May 2015, CMG received a cease-and-desist letter from FameFlynet regarding CMG's use of several of the Images, including the Hayek, Bynes, and Gomez Images. (Jackson Aff. ¶ 15-16; DTX 4). CMG's then-President, Bryant Jackson, contacted FameFlynet's head of sales, Justin Smith, to discuss the letter, (Trial Tr. 84-85, 93), and the parties began negotiating a subscription package pursuant to which CMG would continue nonexclusively using certain FameFlynet photographs for a monthly fee, (Jackson Aff. ¶ 18; DTX 5). Jackson testified that, in their first conversation following CMG's receipt of the cease-and-desist letter, Smith told him "not to worry" about the FameFlynet Images depicted in the letter. (Jackson Aff. ¶ 17). The

proposed subscription arrangement, however, was never consummated.  (Jackson Aff. ¶ 19).

CMG subsequently deleted the Images included in the cease-and-desist letter, as well as other

licensed and unlicensed content, from its websites in August 2015.  (Jackson Aff. ¶ 20).  More

than one year later, on September 29, 2016, Plaintiffs filed the instant action.

## DISCUSSION

There is no dispute that CMG used Plaintiffs' validly copyrighted Images in whole or in

substantial part, and without authorization, thus establishing a *prima facie* case of copyright

infringement.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) ("To

establish infringement, two elements must be proven: (1) ownership of a valid copyright, and

(2) copying of constituent elements of the work that are original.").  Instead, CMG defends its

use of the Images — or, more precisely, of all but one of the Images, as it concedes liability with

respect to the Deschanel Image, (*see* Def. PFOF ¶ 59) — on either or both of two grounds: first,

that Plaintiffs waived any infringement claim with respect to six of the Images and, second, that

CMG's use of all of the Images was fair use under Section 106 of the Copyright Act.  The Court

will address each defense in turn.

## A.  Waiver

CMG argues, first, that FameFlynet waived its infringement claims with respect to the

Hayek, Bynes, and Gomez Images.  Under New York law, which the parties agree governs for

these purposes, "a claim of waiver requires proof of an 'intentional relinquishment of a known

right with both knowledge of its existence and an intention to relinquish it.'"  *Capitol Records,*

*Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004) (quoting *Airco Alloys Division,*

*Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (N.Y. App. Div. 1980)); *see*

*also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  It is well established, moreover, that "the law

disfavors agreements intended to absolve a party from the consequences of its wrongdoing."
*Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382-83 (S.D.N.Y. 2005). Accordingly, "releases and covenants not to sue are subject to the 'closest of judicial scrutiny' to determine the intent of the parties." *Id.*; *see also Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 515 (2d Cir. 2001) ("A release will not be given effect unless it contains an explicit, unequivocal statement of a present promise to release a party from liability." (internal quotation marks and brackets omitted)); *cf. Schneider v. Revici*, 817 F.2d 987, 993 (2d Cir. 1987) ("New York requires that a covenant not to sue must be strictly construed against the party asserting it. Moreover, its wording must be clear and unequivocal." (internal quotation marks and ellipsis omitted)).

Measured against these standards, CMG's argument that FameFlynet waived its infringement claims is meritless. Its argument relies solely on Smith's alleged statement to Jackson that CMG was "not to worry" about the Images referenced in the May 2015 cease-and-desist letter. But even assuming *arguendo* that Smith otherwise had authority to waive FameFlynet's rights, that stray comment cannot be construed as a knowing waiver for several reasons. First, by Jackson's own admission, Smith did not know about the cease-and-desist letter, (Trial Tr. 93), let alone its contents, so it cannot be said that he intentionally relinquished a right "with . . . knowledge of its existence." *Capitol Records*, 372 F.3d at 482. Second, Smith gave no explicit indication that he intended to release CMG from liability for infringement. *See, e.g. Golden Pac. Bancorp*, 273 F.3d at 515. And third, the totality of circumstances makes clear that Smith had no such intention. Most notably, following the "not to worry" comment, he and Jackson made efforts to broker a licensing agreement pursuant to which CMG would pay for the use of FameFlynet's Images going forward — negotiations that would have been unnecessary had FameFlynet already waived its infringement claims. *See Joao*, 376 F. Supp. 2d at 384 ("No

one would seriously entertain the possibility of taking a license if infringement claims had already been released.").  In short, the evidence does not support CMG's claim of waiver.

In the alternative, CMG's waiver claim might be better understood as a claim that FameFlynet granted CMG an implied nonexclusive license to use the Hayek, Bynes, and Gomez Images.  *See, e.g.*, *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.").  But CMG did not plead the existence of a license as an affirmative defense, and thus waived any such claim.  *See id.*; *see also Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) ("[T]he possession of a license by an accused infringer traditionally has been characterized as a matter of affirmative defense.").  And, in any event, the defense would fail on the merits, as it requires proof, at a minimum, "of a meeting of the minds between the licensor and licensee such that it is fair to infer that the licensor intended to grant a nonexclusive license."  *Assoc. Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013).  "There can be no meeting of the minds . . . where essential material terms are missing."  *Vian v. Carey*, No. 92-CV-0485 (MBM), 1993 WL 138837, at *3 (S.D.N.Y. Apr. 23, 1993) (Mukasey, J.).  And where, as here, the alleged licensing agreement is oral, "the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty."  *Id*. at *2 (quoting *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982) (declining to find an oral nonexclusive licensing agreement given the absence of any evidence that the defendant "ever intended . . . to enter into a complex commercial licensing agreement")); *see also, e.g.*, *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) ("Courts have found implied licenses only in 'narrow' circumstances . . . .").

Suffice it to say, Smith's alleged "not to worry" comment does not establish that there was a "meeting of the minds" between the companies to license the use of the Images. Indeed, the subsequent attempt by the parties to negotiate a subscription arrangement reveals that both sides believed it was necessary for CMG to pay for a license to continue using FameFlynet's copyrighted content. Furthermore, Smith's statement included none of the "essential material terms" necessary for a nonexclusive licensing agreement, and "the necessary consideration for the contract [was] wholly lacking." *Vian*, 1993 WL 138837, at *3. Finally, CMG's decision to remove the Images from its websites after its negotiations with FameFlynet fell through belies any notion that CMG believed it had an implied nonexclusive license to continue using the Images. At most, Smith's statement could be construed as an agreement to agree or an agreement to negotiate — neither of which is enforceable under New York law. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) ("[I]t is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."). Accordingly, to the extent CMG argues the existence of an implied license, that argument also fails.

**B. Fair Use**

The Court turns, then, to CMG's other defense: fair use. *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (holding that fair use is an affirmative defense). Section 106 of the Copyright Act grants the owner of a copyrighted work "exclusive rights" over the copyrighted work, including the rights "to reproduce the copyrighted work," "to prepare derivative works based upon the copyrighted work," and "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106; *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir.

2010) ("The owner of a copyright has the exclusive right to — or to license others to — reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work.").  These protections are designed to further the essential purpose of copyright law: the promotion of "not simply individual interests, but — in the words of the Constitution — 'the progress of science and useful arts' for the benefit of society as a whole." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 177 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2175 (2017).  "Anyone who violates any of the exclusive rights of [a] copyright owner" is liable for infringement.  17 U.S.C. § 501(a).

Nevertheless, and "consistent with this public purpose," *TCA Television*, 839 F.3d at 178, copyright protection does not "accord[] the copyright owner complete control over all possible uses of his work," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984). In particular, "[a]ny individual may reproduce a copyrighted work for a 'fair use,'" and such use does not infringe upon the owner's copyright.  *Id.* at 433; *see also* 17 U.S.C. § 107.  Fair use "is an equitable rule of reason, which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (citation omitted) (internal quotation marks omitted). Its origins lie in the common law, but it is now codified in Section 107 of the Copyright Act, which provides in relevant part as follows:

> [T]he fair use of a copyrighted work, including such use by
> reproduction in copies . . . , for purposes such as criticism,
> comment, news reporting, teaching . . . , scholarship, or research, is
> not an infringement of copyright.  In determining whether the use
> made of a work in any particular case is a fair use the factors to be
> considered shall include —
>
>> (1) the purpose and character of the use, including whether
>> such use is of a commercial nature or is for nonprofit
>> educational purposes;

> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see also Campbell*, 510 U.S. at 577 ("Congress meant § 107 to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way and intended that courts continue the common-law tradition of fair use adjudication." (internal quotation marks omitted)).  Fair use analysis must be conducted on a "case-by-case" basis, and the statutory factors may not "be treated in isolation," but must "[a]ll . . . be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell*, 510 U.S. at 577-78.  The analysis is ultimately aimed at determining whether a use is the type "that furthers the essential goal of copyright law and should be excused from liability for infringement."  *Estate of Smith v. Cash Money Records, Inc.*, No. 14-CV-2703, 2017 WL 2333770, at *7 (S.D.N.Y. May 30, 2017).

Here, CMG asserts fair use with respect to eleven of the twelve Images at issue (namely, all but the Deschanel Image).  The Court will consider each of the four fair use factors in turn, addressing the Images together or in groups to the extent possible.  *See, e.g.*, *Cariou v. Prince*, 714 F.3d 694, 706-10 (2d Cir. 2013) (examining twenty-five artworks together because they shared common aesthetics and characteristics, and separating out five additional works for more individualized analysis).  Ultimately, however, the Court must — and does — make a separate determination as to fair use with respect to each of the eleven Images at issue.  *See, e.g.*, *Craft v. Kobler*, 667 F. Supp. 120, 123 (S.D.N.Y. 1987).

### 1. The Purpose and Character of the Use

The first statutory fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The analysis is "guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like." *Campbell*, 510 U.S. at 578-79 (citation omitted). "The central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Id.* at 579 (citations omitted) (internal quotation marks and brackets omitted). "If the secondary use adds value to the original — if copyrightable expression in the original work is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings — this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (internal quotation marks and brackets omitted). Transformative use is neither "absolutely necessary" nor sufficient for a finding of fair use, but original works that have been transformed by a subsequent user "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579 (citations omitted).

Applying those standards here, the first factor cuts strongly against CMG. CMG's use of the Images had no transformative effect because it displayed the Images in the same manner and for the same purpose as they were originally intended to be used. Paparazzi photographs — the

bulk of the Images — are designed to document the comings and goings of celebrities, illustrate their fashion and lifestyle choices, and accompany gossip and news articles about their lives. As CMG points out, such images are fleetingly relevant and have limited staying power (and therefore market power) beyond a short window in which they offer timely news and gossip about their subjects. (Coakley Aff. ¶ 23). The purposes for which CMG used the Images — to serve as banner images and thumbnails for "Daily Dumps" of celebrity news (namely, the Hayek and Michele Images); to accompany articles about celebrity gossip and human interest stories (namely, the Bynes, Loughrey, and Horrocks Images); and to be included in roundups of celebrity fashion trends (namely, the Gomez Image) — are all consistent with the original intent behind taking and copyrighting the Images. Thus, CMG's use was not transformative.

CMG is correct in noting that the preamble of Section 107 carves out categories of reproduction that are likely to constitute fair use, but it is incorrect in asserting that its use of the Images fell within one of those categories. Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about* that work. *See* 17 U.S.C. § 107. For instance, a news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about. *See, e.g.*, *Konangataa v. Am. Broadcastingcompanies, Inc.*, No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017). Similarly, a depiction of a controversial photograph might fairly accompany a work of commentary or criticism about the artistic merit or appropriateness of the photograph. *See, e.g.*, *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000). In each such case, the copyrighted work is itself the subject of the story, transforming the function of the work in the new context.

Notwithstanding CMG's assertions, however, that is not what happened here. With respect to the Bynes Images, CMG used photographs of an actress to accompany a story about the appearance of that actress, which could be seen in the displayed photographs. The Gomez Image appeared in an album containing photographs of celebrities participating in the "underbutt" fashion trend. And for the Loughrey and Horrocks Images, CMG used photographs depicting the subjects of human interest stories — about mania surrounding the birth of the royal baby and a mother's plastic surgery to resemble her daughter, respectively — to accompany articles about those topics. CMG's articles did not comment on, criticize, or report news *about the Images themselves*; instead, they used the Images as illustrative aids because they depicted the subjects described in its articles. CMG's argument, if accepted, would eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story about the subject of that photograph. That is plainly not the law. *See, e.g.*, *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 406 n.6 (S.D.N.Y. 2016) ("Defendant confuses the situation in which the *photograph* is the story . . . and the scenario present here, in which the *contents* of the photograph are of some public interest. . . . Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.").

Similarly, CMG's argument that it transformed the Hayek and Michele Images by using them as banner photographs on its "Daily Dump" gossip roundups fails. CMG claims that it used the photographs to entice its visitors to other websites containing celebrity news and gossip, thereby adding new information or meaning to the photographs, but CMG points to no new information or meaning it infused into the Hayek and Michele Images by pairing them with links to articles about those celebrities. CMG further argues that it turned the Images into "collages"

by adding text to those Images. Original works clearly may be transformed through the addition of text or other forms of expression. *See Cariou*, 714 F.3d at 706-10; *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006). But here, the text appended to the Images were the words "Daily Dump," the title of CMG's link roundup, and those words added no meaning or information to the Images themselves and imbued the originals with no new creative or expressive purpose.[3]

Further counseling against a finding of fair use is the commercial nature of CMG's use of the Images. "The crux of the profit/nonprofit distinction is . . . whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Here, CMG's business model turned on displaying, often without authorization, paparazzi photographs on its websites. It deliberately used images that it did not — and admittedly could not afford to — license in order to lure traffic and illustrate its celebrity and human interest content. By featuring Plaintiffs' Images prominently alongside headlines and news articles about the subjects of those Images, CMG naturally "st[ood] to profit from exploitation of the copyrighted material without paying the customary price." *Id.* This was designed to serve CMG's bottom line. CMG's argument that its use of the Images was not commercial because CMG's websites are unprofitable is unavailing: The commercial or nonprofit nature of a venture is not determined by whether it was *successful* commercially. Accordingly, the first statutory factor weighs heavily against CMG, as its use of the Images was non-transformative and commercial.

---

[3]    Relying on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), CMG also argues that the thumbnail version of the Hayek Image was transformative because it served a different function from the original Image, namely directing website visitors to other gossip and entertainment websites displaying a full-size version of that Image. (Def. PFOF ¶ 18). Because CMG also used the Hayek Image as a banner photographs on the same webpage, and because that use was not fair, it is unnecessary to address whether displaying the Image in thumbnail version constituted fair use.

## 2.    The Nature of the Copyrighted Work

By contrast, the second statutory factor, "the nature of the copyrighted work" or "the value of the materials used," *Campbell*, 510 U.S. at 586, cuts slightly in CMG's favor.  The second factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Id.*  Specifically, copyrighted works that are creative or fictional are closer to the core of copyright, and therefore less likely to be fairly used, than works that are factual in nature.  *See id.* (collecting cases); *see also Stewart*, 495 U.S. at 237 ("In general, fair use is more likely to be found in factual works than in fictional works.").  That said, "[t]he mere fact that the original is a factual work . . . should not imply that others may freely copy it," as "authors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1658 (2016).  Because both creative and factual original works are entitled to some level of copyright protection, the second fair use factor is frequently not much help in a fair use analysis.  *See, e.g.*, *Campbell*, 510 U.S. at 586; *Blanch*, 467 F.3d at 257; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006).

This factor weighs in favor of CMG, but only marginally so, because Plaintiffs' Images are essentially factual in nature.  The photographers predominantly captured their subjects in public, as they naturally appeared, and were not tasked with directing the subjects, altering the backdrops, or otherwise doing much to impose creative force on the Images or infuse the Images with their own artistic vision.  Although photography, including photography of a celebrity walking around in public, certainly involves skill and is not devoid of expressive merit, the Images are further from the core of copyright protections than creative or fictional works would

be.  That is true even for the Horrocks Images, which are more staged than the others, as they too are factual in nature and do not reflect substantial creative expression.  Nonetheless, this factor does not carry great weight in favor of a finding of fair use, particularly because "the use that [CMG] seeks to make of the material is similarly 'non-creative' and purely commercial."  *Fin. Info., Inc. v. Moody's Inv'rs Serv., Inc.*, 751 F.2d 501, 509 (2d Cir. 1984).

### 3.  The Amount and Substantiality of the Portion Used

The third factor considers whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" — in other words "the quantity and value of the materials used" — "are reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  When evaluating this factor, "the court must examine the quantitative and qualitative aspects of the portion of the copyrighted material taken."  *Bill Graham Archives*, 448 F.3d at 613.  That is, the Court must weigh "whether the amount copied is reasonable in relation to the purported justifications for the use under the first factor."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).  Here, those considerations weigh against a finding of fair use.  First, CMG used all or most of each original Image in its website displays.  The Bynes, Loughrey, and Horrocks Images were used more or less in their entirety.  For the Gomez Image, CMG did crop out some of the background of the photograph and portions of the singer's body, but it nonetheless focused on the portion of the Image most likely to grab viewers' attention and induce consumers of celebrity gossip and fashion trends to view the Image — namely, Gomez's "risqué" fashion choice.  Finally, the Hayek and Michele Images cut the actresses more or less in half, but provided enough content to show some of the subjects' attire and indicate the behavior in which they were engaged.  More importantly, as discussed above, in each case, CMG used the Image exactly as it was intended to be used by its creators and not in a

transformative fashion.  As such, the "purported justification[]" for the use was not reasonable, and thus the qualitative and quantitative amounts used were inherently unreasonable as well. *HathiTrust*, 755 F.3d at 96.

### 4. The Effect of the Use

The final factor — "the effect of the use upon the potential market for or value of the copyrighted work" — looks "to not only the market harm caused by the particular infringement, but also to whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives*, 448 F.3d at 613; *see also Harper & Row*, 471 U.S. at 568 ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." (internal quotation marks omitted)).  This factor "is undoubtedly the single most important element of fair use," because "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566-67; *see also* S. Rep. No. 94-473 (1975) ("[A] use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement.").  Here, this factor also favors Plaintiffs.  Because CMG displayed the Images for the very purpose for which they were originally intended, its use necessarily "usurp[ed]" the function of the original works in the market.  *Cariou*, 714 F.3d at 708.  It may well be that CMG used lower-resolution versions of the original Images, but CMG has done nothing to show that there is an independent market for the higher-resolution versions or that the general audience for paparazzi and human-interest photographs would not be equally satisfied with its versions.  Moreover, if CMG's practice of using celebrity and human interest photographs without licensing were to become widespread, it is intuitive that the market for such images would diminish

correspondingly:  If gossip and entertainment websites could use such images for free, there would be little or no reason to pay for Plaintiffs' works.

### 5.  The Factors Considered Together

Considering the statutory factors together, the Court concludes that CMG's use of the Images was not fair.  Collectively, the Court finds that CMG copied all or a significant part of Plaintiffs' Images without adding new information or meaning, and for the same commercial purpose that Plaintiffs originally intended for the Images, displacing and superseding the market for the original works.  Reproducing a work, in whole or in substantial part, exactly as it was intended to be used by its owner, and without permission, is not "the type of use that furthers the essential goal of copyright law and should be excused from liability for infringement."  *Cash Money Records*, 2017 WL 2333770, at *7.  Accordingly, CMG's fair use defense fails.

## C.  Relief

In light of the foregoing, the Court finds that CMG is liable to Plaintiffs for copyright infringement.  That raises the question of relief.  As an initial matter, Plaintiffs are entitled to a final injunction prohibiting CMG from infringing on its copyrights over the Images.  *See* 17 U.S.C. § 502(a) (providing that a court may "grant . . . final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright").  "A court may issue such a permanent injunction based on its consideration of (1) the likelihood that plaintiff will suffer irreparable harm if an injunction is not granted; (2) whether remedies at law such as monetary damages are inadequate to compensate plaintiff for that harm; (3) the balance of hardships; and (4) whether the public interest would not be disserved by a permanent injunction."  *Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015) (citing *Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010)).  These factors all weigh in favor of the requested

injunction.  First, as "courts routinely find" in these contexts, any lost sales suffered in the copyright context are "difficult if not impossible to measure," inflicting irreparable harm.  *Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016).  Additionally, as discussed above, these infringements have a superseding effect on the market for Plaintiffs' Images, rendering money damages potentially inadequate to account for future harm from such infringements.  Finally, "it is axiomatic," in considering the balance of hardships, "that an infringer cannot complain about the loss of ability to offer its infringing product," *Rovio*, 97 F. Supp. 3d at 547, and "injunctive relief here will advance the public's compelling interest in protecting copyright owners' marketable rights to their work so as to encourage the production of creative work," *Prana Hosp.*, 158 F. Supp. 3d at 196 (internal quotation marks and brackets omitted).  Accordingly, injunctive relief is appropriate.

Additionally, Section 504 of the Copyright Act provides that a copyright infringer may be liable either for "the copyright owner's actual damages and any additional profits of the infringer" or for statutory damages, at the election of the copyright owner.  17 U.S.C. § 504(a), (c).  Actual damages "should be broadly construed to favor victims of infringement."  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001).  At the same time, because "awarding the copyright owner the lost license fee can risk abuse" where owners seek to "claim unreasonable amounts as the license fee," courts must not base actual damages on "undue speculation" but should instead look to the fair market value of the copyrighted work.  *On Davis*, 246 F.3d at 166.  Statutory damages, on the other hand, range from a minimum of $750 up to $30,000 per copyrighted work, 17 U.S.C. § 504(c)(1), and are available "for those works whose copyrights were registered at the time the infringement occurred," *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1114 (2d Cir. 1986).  "Within these limitations the court's discretion and

sense of justice are controlling." *D.C. Comics Inc. v. Mini Gift Shop*, 912 F.2d 29, 34 (2d Cir.

1990). Factors to be considered in determining the amount of statutory damages include:

"(1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3)

the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties;

(5) the infringer's cooperation in providing evidence concerning the value of the infringing

material; and (6) the conduct and attitude of the parties." *Bryant v. Media Right Prods., Inc.*, 603

F.3d 135, 144 (2d Cir. 2010). Statutory damages should "discourage wrongful conduct, as well

as . . . provide reparation for injury." *Prana Hosp., Inc.*, 158 F. Supp. 3d at 197-98 (internal

quotation marks omitted). To achieve this purpose, courts often impose as statutory damages a

multiple of the applicable licensing fee a defendant would have paid but for the infringement.

*See, e.g.*, *Erickson Prods., Inc. v. Only Websites, Inc.*, No. 12-CV-1693 (PGG), 2016 WL

1337277, at *2-3 (S.D.N.Y. Mar. 31, 2016); *see also FameFlynet, Inc. v. Shoshanna Collection,*

*LLC*, No. 16-CV-7645, 2017 WL 4402568, at *5 (S.D.N.Y. Oct. 2, 2017).

Here, Plaintiffs seek statutory damages for all the Images except the Bynes Images,

which were not timely registered. *See* 17 U.S.C. § 412.[4] Before turning to those requests,

however, a general comment is warranted. As the sole support for their calculations of damages,

Plaintiffs introduced spreadsheets reflecting every licensing transaction for each Image. (PTX

35-41). Notably, however, Plaintiffs did not call any witness involved in the preparation of the

---

[4]       At times, Plaintiffs use the word "willful[]" to describe CMG's conduct, (*see* Docket No.
37 ("Pls.' PFOF") ¶¶ 258-60), but they failed to establish willful infringement or requested
damages consistent with willful infringement. *See* 17 U.S.C. § 504 (providing for enhanced
damages only "where the copyright owner sustains the burden of proving, and the court finds,
that infringement was committed willfully"); *see also Island Software & Computer Serv., Inc. v.*
*Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) ("To prove 'willfulness' under the Copyright
Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity,
or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness
to, the copyright holder's rights." (internal quotation marks omitted)).

spreadsheets or in negotiating the licensing agreements reflected in the charts. (Trial Tr. 13-14, 16-17, 59). Instead, Plaintiffs' sole witness, Randy Taylor, is a principal of the copyright tracking service that both Plaintiffs employ to register their photographs and videos with the Copyright Office and track potential infringements. (Taylor Aff. ¶¶ 2-6). As such, he was able to testify only about licensing arrangements in general, not about the specific licensing arrangements for the Images. Thus, he could not identify whether a given license was exclusive or nonexclusive, was for print use or the web (or both), or was for multiple photographs or for only a single photograph within a set. What is more, Taylor's testimony was, in some respects, inconsistent with the transactions listed on Plaintiffs' spreadsheets. For example, he testified that the initial licensing period for a photograph is often an "exclusive licensing period," (Trial Tr. 19-20, 54), yet the spreadsheets reveal that several Images were licensed to multiple outlets on the first day of publication, (*see, e.g.*, PTX 35, 37). The end result is that Plaintiffs largely fail to demonstrate that they are entitled to damages based on the higher end of the range of fees reflected in their spreadsheets. *See, e.g.*, *Boisson v. Banian Ltd.*, 280 F. Supp. 2d 10, 17-19 (E.D.N.Y. 2003); *see also* 4 Nimmer on Copyright § 14.01[C][1] (2017) ("[A] finding of liability is not a lottery ticket. In all instances, the relief should match the proof.").

### 1. Actual Damages

Plaintiffs seek $2,680 in actual damages for CMG's unauthorized use of the Bynes Images. (Docket No. 53 ("Pls.' Mem."), at 5). Plaintiffs reach that number by averaging all of the licensing fees ever paid for the Bynes Images — including $8,000 paid by People Magazine and $3,400 paid by TMZ.com — and multiplying that number by four, to account for each of the four Bynes Images CMG displayed. (*See* Pls.' Mem. 5; PTX 35). Plaintiffs, however, cite no legal authority to support that averaging approach rather than identifying the transaction or

transactions that represent the fair market value of the unauthorized use. Moreover, Plaintiffs' calculation cannot be squared with the testimony of their sole witness, Taylor, who stated that (1) when an infringing use occurs immediately upon publication, the relevant time period for identifying the reasonable licensing fee should be the narrow window immediately after publication, not the entire time period in which an image was available for licensing, (Trial Tr. 53-54); (2) publications such as People Magazine and TMZ.com would typically pay higher licensing fees than would CMG's websites because of the their greater circulation, reputation, and name recognition, (Trial Tr. 14-15, 24); (3) among the publications that purchased Plaintiffs' photographs, Popsugar.com is "similar enough" to CMG's websites, (Trial Tr. 40); and (4) there is no way to tell from Plaintiffs' spreadsheets detailing licensing transactions whether a given licensee paid for multiple photographs or a single photograph within a copyrighted set, (Trial Tr. 29). Accordingly, the Court concludes that an appropriate and nonspeculative actual damages amount for the Bynes Images is $255 — the licensing fee paid by CMG competitor Popsugar.com on the first day that any publication paid to display the Bynes Images. (PTX 35). Further, because it is unclear from the evidence Plaintiffs introduced at trial whether Popsugar.com paid for one or more of the Bynes Images, there is no basis to quadruple that amount to account for the four Images that CMG used. Accordingly, the Court awards Plaintiffs $255 for CMG's infringement of the Bynes Images.

## 2. Statutory Damages

As noted, Plaintiffs seek statutory damages for the rest of the Images. To determine damages sufficient to "provide reparation for injury," the Court considers the expenses saved and profits earned by CMG, on the one hand, and the revenue lost by Plaintiffs, on the other. *Broad. Music*, 158 F. Supp. 3d at 197-98. To determine the fair market value of the Images to a licensee

in CMG's position at the time of the infringements, the Court looks to the spreadsheets Plaintiffs introduced and to certain principles derived from the limited testimony Taylor offered to explain those spreadsheets. First, the Court credits Taylor's testimony that an image licensed during the "exclusive licensing period" immediately after the photograph was taken would likely command a higher price than one purchased after the image was made available on a nonexclusive basis. (Trial Tr. 53-54). Second, the Court concludes that a reasonable licensing fee for CMG would have been substantially lower than the fees paid by more well-known publications and platforms, such as People Magazine and TMZ.com, and would have been closer to the fees paid by CMG's competitors, such as Popsugar.com. (Trial Tr. 14-15, 24, 40). Finally, although Taylor testified that there would be a "strong downward pressure on price" where CMG used an Image before or during the exclusive licensing period, he lacked firsthand knowledge with respect to whether any potential purchaser declined to license an image or paid less than it otherwise would have because CMG scooped it, (Trial Tr. 42-43); accordingly, the Court declines to adjust the reasonable licensing fees based on Taylor's testimony regarding "downward pressure."

Several other considerations inform the Court's assessment of the damages needed to "discourage wrongful conduct." *Broad. Music*, 158 F. Supp. 3d at 197-98. First, after receiving FameFlynet's cease-and-desist letter, CMG sought to license FameFlynet's content and took down the referenced Images, as well as other unlicensed Images. (*See* Jackson Aff. ¶ 17-20). CMG's apparent willingness to properly license Plaintiffs' content counsels against the need for substantial damages to deter CMG from infringing in the future. Second, several of CMG's witnesses testified about practices the company has put into place recently to ensure that content on its websites is properly licensed. Moreover, although the Court was unpersuaded by CMG's waiver defense as a bar to liability, Plaintiffs' lackadaisical approach to enforcing its copyrights

with respect to some of the Images, (Trial Tr. 84-85), reflects on the "infringer's state of mind" and the "conduct and attitude of the parties." *Bryant*, 603 F.3d at 144.

On the flip side, at the time of the infringements at issue in this action, CMG had what can only be described as a casual approach to copyright protection, with no real checks in place to ensure that copyrighted content was used only in an authorized manner. Jackson, for example, testified to a general policy at CMG against using "anything that . . . appeared to be a paparazzi photo or a photo that appeared to be a licensable photo," suggesting an awareness that such photographs were not fair game without a license. (Trial Tr. 80). Indeed, Jackson indicated that CMG knew at the time of the instant infringements that the use of paparazzi photographs to which it did not have "access" could "willfully infringe" photographers' rights. (Trial Tr. 89). Yet several CMG employees did not recall *any* initial training on avoiding copyright infringement, (Trial Tr. 107-08, 114), and CMG staffers used paparazzi photographs on CMG's websites on numerous occasions, at times with the knowledge of supervisors, (*see, e.g.*, DTX 24 ¶ 14). Indeed, CMG editor Joe Kinsey testified that he recalled being told early in his tenure at CMG that using low-resolution versions of unlicensed images and linking to another website displaying those images was permissible, (Trial Tr. 104); similarly, CMG editor Alexa Lyons testified that staffers "were told [they] could take screenshots of videos if they were credited," regardless of whether the images were derived from content CMG licensed, (Trial Tr. 108). Although Jackson testified that he "constantly" checked CMG's website for issues like formatting and spelling, he did not have a practice of confirming that no infringing material appeared on those websites. (Trial Tr. 92). Jackson further testified that although he believed CMG's displays of images like the Plaintiffs' to be fair use, he never consulted with an attorney to confirm that belief. (Trial Tr. 82, 89-90). Finally, the Court is also mindful that paparazzi

photographs are a common target of infringement and, thus, that there is some need for general deterrence.  (*See* Trial Tr. 43-44).  *See also, e.g.*, *Shoshanna*, 2017 WL 4402568 (reflecting a recent instance of copyright infringement with respect to paparazzi photographs); *Gossip Cop*, 196 F. Supp. 3d 395 (same); *BWP Media USA Inc. v. Uropa Media, Inc.*, No. 13-CV-7871 (JSR) (JCF), 2014 WL 2011775 (S.D.N.Y. May 16, 2014) (same).

Given the foregoing considerations, the Court concludes that statutory damages for each of the Images should be the statutory minimum of $750 or five times the reasonable licensing fee, whichever is greater.  *See, e.g.*, *Prana Hosp.*, 158 F. Supp. 3d at 199 ("Second Circuit case law . . . reflects that courts in this Circuit commonly award, in cases of non-innocent infringement, statutory damages of between three and five times the cost of the licensing fees the defendant would have paid."); *see also id.* (rejecting plaintiff's request for statutory damages in the amount of six times the sum of unpaid licensing fees because "plaintiffs have not explained the basis for exceeding that customary norm").[5]  More specifically, weighing the six factors relevant to the analysis, the Court fixes damages for each of the Images as follows:

- **The Hayek Image:**  CMG displayed the Hayek Image on one of its websites on the first day on which that Image was licensed.  Although Taylor testified that the earliest transaction, with TMZ TV for $1,200, constituted an exclusive license, (Trial Tr. 20-21), this is contradicted by Plaintiffs' spreadsheet, which reflects a transaction on the same day with wwtdd.com for $60, (PTX 37).  Moreover, during the initial weeks in which the Hayek Image was licensed, it also sold to Us Weekly Online for $175, In Touch for $600, and Egotastic.com for $105.  None of these transactions is an obvious "reasonable" fee that CMG would have paid for the Images:  Taylor testified that TMZ would generally pay more to license

---

[5]      Plaintiffs originally contended that they were entitled to the greater of five times the minimum statutory amount or five times a reasonable licensing fee for each infringing use.  (*See* Pls.' PFOF ¶¶ 254, 255).  But — perhaps because the Court questioned that contention at the final pretrial conference — Plaintiffs appear to have abandoned that position after trial.  (*See* Pls.' Mem. 3-5).  In any event, Plaintiffs' request was based on an erroneous reading of case law and the function of the statutory minimum, which sets a damages floor for an infringing use and is not intended to substitute for a reasonable licensing fee, the amount that is generally increased by a multiplier to set appropriate statutory damages.  *See Shoshanna*, 2017 WL 4402568, at *5.

images than would a platform like CMG. (Trial Tr. 15). In Touch has both a print and an online presence, and Plaintiffs did not introduce evidence that would allow the Court to assess how licensing fees would differ for a publication with multiple platforms. (*See, e.g.*, Trial Tr. 22). Moreover, the Us Weekly, In Touch, and Egotastic purchases occurred a week or more after the Image was first licensed, likely outside any exclusive licensing period (if one in fact existed). (PTX 37). Finally, the Court has no clear basis from the evidence introduced to distinguish among the various online publications that purchased the Hayek Image. Given this record, the Court finds that Us Weekly Online, a celebrity gossip website that licensed the Image a week after it was first published, is the closest proxy for the licensing fee CMG would have paid, and thus awards Plaintiffs $875 for CMG's use of the Hayek Image.

- **The Gomez Image:** The Gomez Image was first licensed on August 1, 2014, and was not used by CMG until August 19, 2014. (PTX 36; Trial Tr. 35-36). Taylor testified that, given this timeline, CMG's use was "clearly . . . outside of the exclusive period" and that "comfortable prices for a Web use during that timeframe" would have been between $100 and $300. (Trial Tr. 37). The Court finds that the high end of that range, the $300 paid by Ok! Magazine Online, (PTX 36), would be a reasonable licensing fee, and thus awards Plaintiffs $1,500 for the use of the Gomez Image.

- **The Michele Image:** Although the Michele Image was taken on December 31, 2014, (JPTO 9), it was not licensed until January 14, 2015, (PTX 38); in the intervening time, CMG posted a cropped version of the Image to one of its websites, (PTX 30). The Image was first licensed for $1,200 by Us Weekly magazine, presumably for a different format from Us Weekly Online — which appears elsewhere on Plaintiffs' spreadsheets — or for multiple formats. (PTX 38). After the Us Weekly transaction, the Michele Image was not licensed again until February 3, 2015, when it was purchased by E! Online.com for $150. (PTX 38). Because CMG used the Michele Image before any buyer paid for an exclusive license, the Court concludes that the $1,200 paid by Us Weekly constitutes a reasonable licensing fee, and thus awards $6,000 for the use of the Michele Image.

- **The Deschanel and Loughrey Images:** Plaintiffs seek only the statutory minimum damages for the Deschanel and Loughrey Images. (Pls.' Mem. 4). Accordingly, the Court awards $750 to Plaintiffs for each of those Images.

- **The Horrocks Images:** Finally, Plaintiffs gave the Court very little assistance in interpreting the licensing history of the Horrocks Image. Despite testimony from Taylor that the Images were published on March 21, 2016, and posted by CMG on March 22, 2016, "within 24 hours of their creation," (Taylor Aff. ¶¶ 124, 131, 134), the first transaction recorded for the Horrocks Images was March 8, 2016, (PTX 41). At trial, Taylor testified that that transaction listing "might be a mistake." (Trial Tr. 51-52). By contrast, Plaintiffs argued in post-trial briefing that the "first exclusive licensed publication was on March 8, 2016 and provided

an exclusive for two weeks until its next licensed usage on March 23, 2016."
(Pls.' Mem. 5). Unfortunately for Plaintiffs, there is no factual basis for that
assertion. Moreover, Plaintiffs do not explain how their claim that the exclusive
licensing period lasted until March 23, 2016, squares with Barcroft's own use of
the Horrocks Images on its YouTube.com channel on March 22, 2016, the same
day CMG shared the Images. Thus, the Court finds that Plaintiffs failed to prove
that CMG's use of the Horrocks Images occurred during the initial exclusive
licensing window. Instead, the Court finds that CMG displayed the Horrocks
Images nearly two weeks after the first transaction, and thus looks to subsequent
transactions with analogous platforms to determine a reasonable licensing fee.
The licensing transactions immediately following CMG's use were to the Daily
Mirror Newspaper for £800 and to Cosmopolitan.com for £60. (PTX 41; *see also*
Trial Tr. 49 (noting that the fees reflected on PTX 41 were in British pounds)).
Taylor testified that Cosmopolitan is a "better known brand" than CMG,
suggesting that Plaintiffs would have been unlikely to command a higher fee from
CMG. (Trial Tr. 49). Accordingly, the Court finds that £60 (or $78.65 using the
current conversion rate, *see* Federal Reserve, Foreign Exchange Rates — H.10
Weekly, *available at* https://www.federalreserve.gov/releases/h10/current (last
visited October 31, 2017)), is a reasonable licensing fee, and thus awards
Plaintiffs $750, the statutory minimum.

In total, Plaintiffs' statutory damages come to $10,625. With the $255 in actual damages

awarded for CMG's infringement of the Bynes Images, the total comes to $10,880.

## D. Attorney's Fees

Section 505 of the Copyright Act authorizes the Court to "award a reasonable attorney's

fee to the prevailing party." 17 U.S.C. § 505. Among the factors that inform a court's decision

about whether to award attorney's fees are "frivolousness, motivation, objective

unreasonableness, and the need in particular circumstances to advance considerations of

compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985

(2016). Substantially for the reasons set forth in CMG's post-trial submission (*see* Docket No.

54, at 4-5), the Court is skeptical of Plaintiffs' claims to attorney's fees here. Nevertheless, the

parties have not briefed the issue, so the Court does not reach it at this time. Instead, Plaintiffs

shall file any application for fees, supported by contemporaneous billing records, within two

weeks of this Opinion and Order; any opposition to such an application shall be filed within two weeks of the application; and any reply shall be filed within one week of any opposition.

## CONCLUSION

For the reasons stated above, the Court concludes that CMG is liable to Plaintiffs for copyright infringement; that Plaintiffs are entitled to statutory and actual damages in the amount of $10,880; and that CMG is enjoined from further unauthorized use of the Images, *see* 17 U.S.C. § 502(a). Plaintiffs shall, after conferring with CMG, submit a proposed judgment consistent with this Opinion and Order by **November 9, 2017**. Further, as discussed, any application for attorney's fees, supported by contemporaneous billing records, shall be filed by **November 16, 2017**; any opposition to such an application shall be filed within two weeks of the application; and any reply shall be filed within one week of any opposition.

SO ORDERED.

Date:   November 2, 2017
       New York, New York
                                    JESSE M. FURMAN
                                United States District Judge